**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1491-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANTE L. ALEXANDER,
a/k/a DONTE ALEXANDER,
and DONTE L. ALEXANDER,

     Defendant-Appellant.

_____

> Argued December 18, 2019 – Decided January 9, 2020
>
> Before Judges Haas and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 15-01-0104.
>
> Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).
>
> Krupa A. Patel, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Krupa A. Patel, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Dante L. Alexander appeals from his conviction and sentence. We affirm.

A Mercer County grand jury indicted defendant on charges of first-degree murder, N.J.S.A. 2C:11-3a(1), N.J.S.A. 2C:11-3a(2), and N.J.S.A. 2C:2-6 (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count 3).

Prior to trial, defendant unsuccessfully moved to suppress certain evidence seized without a warrant, including a gun and face masks recovered from his former girlfriend's car, as well as her E-ZPass records. Pursuant to N.J.R.E. 404(b), the State moved to introduce evidence to prove defendant planned to shoot and kill the murder victim, Brandon Nance, on multiple occasions prior to the day of Nance's murder. The trial court granted the State's 404(b) motion.

In May 2017, a jury found defendant guilty of counts one and two, and not guilty of count three. At sentencing in September 2017, the trial judge merged count two into count one and imposed a fifty-year prison term, subject

to an eighty-five percent parole ineligibility period under the No Early Release

Act (NERA), N.J.S.A. 2C:43-7.2.

On appeal, defendant raises the following arguments:

POINT I

THE ADMISSION OF OTHER-CRIMES EVIDENCE THAT DEFENDANT HAD, ON PRIOR OCCASIONS, DRIVEN AROUND THE CITY LOOKING TO SHOOT THE VICTIM WAS ERRONEOUS AND FAR TOO PREJUDICIAL IN A CASE WHERE DEFENDANT WAS ALLEGED TO HAVE FATALLY SHOT THE VICTIM. THE RESULTANT DENIAL OF A FAIR TRIAL DEMANDS REVERSAL OF THE CONVICTIONS. U.S. Const. amends. V and XIV; N.J. Const., art. I, ¶¶ 1, 9 and 10.

POINT II

THE TRIAL COURT ERRONEOUSLY DENIED SUPPRESSION OF THE [E-ZPASS] RECORDS, WHICH WERE OBTAINED WITHOUT A WARRANT, AND WHICH THE STATE INTRODUCED TO SHOW CONSCIOUSNESS OF GUILT. U.S. Const. amends. IV and XIV; N.J. Const., art. I, ¶ 7.

POINT III

IF THE CONVICTIONS ARE NOT REVERSED, THE MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING ON THE MOTION TO SUPPRESS THE FACE MASKS.

POINT IV

> THE [FIFTY-YEAR] NERA SENTENCE WAS
> MANIFESTLY EXCESSIVE AND MUST BE
> REDUCED IF THE CONVICTIONS ARE NOT
> REVERSED. (Not Raised Below).

In his pro se supplemental brief, defendant presents the following arguments:

POINT I

> TRIAL COURT COMMITTED REVERSIBLE
> ERROR WHEN IT ADMITTED IDENTIFICATION
> CHARGE TO THE JURY OVER DEFENDANT[']S
> OBJECTION.

POINT II

> ERRONEOUS JURY INSTRUCTIONS ON
> ACCOMPLICE LIABILITY DID NOT COMPLY
> WITH STATE V. BIELKIEWICZ.[1]

Having considered these arguments in light of the applicable law and facts, we perceive no basis to disturb defendant's conviction and sentence.

We discern the following facts from the record. On August 29, 2013, at around 12:22 p.m., two masked men shot and killed Brandon Nance.[2] Surveillance video confirmed the two assailants chased Nance and shot him

---

[1] State v. Bielkiewicz, 267 N.J. Super 520 (1993).

[2] The record reflects Brandon Nance also was known as "Bizzy."

multiple times as he ran from them. Nance finally collapsed on a sidewalk in front of a bakery, where his assailants shot him again and fled the scene. A medical examiner testified Nance died as a result of several gunshot wounds to his body, including wounds to his heart and lungs. A ballistics expert testified that sixteen shots were fired at the scene from two different guns. The murder weapons were not recovered.

About one month after Nance's murder, defendant's former girlfriend, Marlise Maisto was driving her Chevy Malibu and was stopped by police for driving through a red light. After the stop, the police had her roll down her tinted window on the driver's side so she could be seen. The police observed Maisto's hands were shaking, she did not make eye contact, and was breathing heavily. The police asked Maisto to step out of her car and she admitted there was a gun in her car that did not belong to her. Further, she advised police she had been assaulted in August 2013 in the parking lot of her apartment. Maisto described her attackers as African American and claimed she had been pistol-whipped. She told the police she sustained significant injuries during the attack, including a broken orbital bone and broken nose. Eventually, officers asked Maisto if she would consent to a search of her car and she agreed to the search. She also admitted the gun in her car belonged to defendant. The search produced

two face masks and a semi-automatic handgun. None of these items were tied to Nance's murder.

In January 2015, Maisto provided additional information to police and implicated defendant in Nance's murder. She also testified at the 404(b) hearing in May 2017. Maisto confirmed that on the day of Nance's murder, defendant left their apartment early in the morning with her red Toyota Camry and returned home around 1:30 p.m. Maisto claimed that when defendant arrived home, he was "full of adrenaline" and pacing back and forth. Defendant eventually told her that he shot someone. Maisto stated defendant also made various phone calls at the apartment and she overhead him saying he shot Nance.

Maisto acknowledged that after Nance's murder, defendant wanted her to trade in her Toyota Camry for another car because defendant drove the Camry on the day of the murder and was concerned someone may have seen it near the murder scene. Within days of the murder, Maisto traded in her Camry for a Chevy Malibu.

Maisto testified that about a month after she traded in her Camry for the Malibu, she received a notice of an E-ZPass violation for the Camry. According to Maisto's testimony, she confronted defendant about the violation and he admitted that after he killed Nance, he took the second assailant to Camden and

A-1491-17T4

then drove through a toll lane without paying, so he could be seen on camera in an area away from the murder scene. A detective from the Mercer County Prosecutor's Office retrieved Maisto's E-ZPass records and the records revealed a toll violation occurred with Maisto's Camry in the afternoon of the murder at 1:18, at the Ben Franklin Bridge toll plaza in Camden. The records also showed the car was registered to Maisto.

In November 2013, defendant's acquaintance, Jerome Koon, also implicated defendant in Nance's murder. After Koon was arrested on an unrelated matter, he told the police that on the same day Nance was murdered, defendant called him and wanted to talk to him in person. Defendant allegedly picked up Koon in a red Toyota Camry (Maisto's vehicle at that time) and confessed he tried to reach Koon earlier that day. Defendant admitted to Koon that when he could not reach him, defendant "chased [Nance] down" and "finished him off." Koon testified at the 404(b) hearing that prior to the murder, he and defendant drove around in the Camry together, trying to find Nance to shoot him. Koon explained, "we was always looking for him after the robbery [involving defendant's drug-dealing associate]. But it was the assault [on Maisto] that intensified it." According to Koon, after Maisto was attacked, defendant became concerned Nance's family knew where he lived.

7                                                                                                A-1491-17T4

# I.

In Point I, defendant argues the judge who addressed the State's 404(b) motion erred in admitting evidence that defendant drove around Trenton looking to shoot Nance before the day of the murder.  Defendant claims such evidence was unduly prejudicial and was not relevant to proving defendant's motive or intent to kill Nance.

An appellate court gives "great deference" to a trial court's determination on the admissibility of "other bad conduct" evidence.  State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010) (citing State v. Foglia, 415 N.J. Super. 106, 122 (App. Div. 2010)).  We apply an abuse of discretion standard; there must be a "clear error of judgment" to overturn the trial court's determination. State v. Castagna, 400 N.J. Super. 164, 182-83 (App. Div. 2008).

N.J.R.E. 404(b) provides that evidence of other crimes or bad acts is generally not admissible, unless used for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."

The concern in admitting evidence of other crimes or bad acts is "the jury may convict the defendant because he is a bad person in general."  State v. Cofield, 127 N.J. 328, 336 (1992) (internal quotation marks omitted).  However,

8

"other crimes evidence may be admissible if offered for any non-propensity purpose, including the need to provide necessary background information about the relationships among the players" involved. State v. Rose, 206 N.J. 141, 180-81 (2011) (emphasis, internal quotation marks, and citations omitted). The evidence is not required to prove or disprove a fact at issue but need only support a desired inference. State v. Swint, 328 N.J. Super. 236, 252-53 (App. Div. 2000).

In Cofield, our Supreme Court set forth a four-pronged test to govern the admission of such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
> 2. It must be similar in kind and reasonably close in time to the offense charged;
> 3. The evidence of the other crime must be clear and convincing; and
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, 127 N.J. at 338; see also State v. Carlucci, 217 N.J. 129, 140-41 (2014) (reaffirming the Cofield test).]

Generally, all four Cofield factors must support the admission of the evidence in question. State v. P.S., 202 N.J. 232, 255 (2010). However, our Supreme Court has clarified the second Cofield prong "need not receive

universal application in [N.J.R.E.] 404(b) disputes." State v. Williams, 190 N.J. 114, 131 (2007).

The Cofield analysis presumes that other-crimes evidence is to be excluded, rather than admitted, as the burden falls on the moving party seeking to admit such evidence. State v. Reddish, 181 N.J. 553, 608-09 (2005). The risk of prejudice from such evidence only has to "outweigh" its probative value in order to compel its exclusion; i.e., the risk does not have to "substantially outweigh" the probative value, as is required under the general standard of N.J.R.E. 403 for excluding relevant evidence. Id. at 608. "An important factor in weighing the probative value of other-crime evidence is whether other, less inflammatory evidence can prove the same fact in issue." State v. Oliver, 133 N.J. 141, 151 (1993). If less inflammatory evidence is as "equally probative" as the other-crimes evidence proffered, while being "less prejudicial," that makes the other-crime evidence inadmissible. Castagna, 400 N.J. Super. at 181.

Our courts "generally admit a wider range of evidence when the motive or intent of the accused is material." State v. Covell, 157 N.J. 554, 565 (2010). "That includes evidentiary circumstances that 'tend to shed light' on a defendant's motive and intent or which 'tend fairly to explain his actions,' even though they may have occurred before the commission of the offense." Ibid. (quoting State v. Rogers, 19

N.J. 218, 228 (1955)). Accordingly, our courts "require a very strong showing of prejudice to justify exclusion" of evidence of motive or intent. Covell, 157 N.J. at 570.

Here, after conducting an N.J.R.E. 104 hearing and adhering to the Cofield principles, the motion judge determined the State could admit evidence that defendant had driven around Trenton looking to shoot Nance before the day of the murder. Although the motion judge used terms such as "motive" and "intent" to sustain admissibility of this evidence and to explain its relevancy, we are satisfied the evidence was highly relevant to prove defendant's plan and purpose in tracking down Nance and shooting his victim. See Stevens, 115 N.J. 289, 305-06 (1989) (addressing the admissibility of evidence that tends to "prove[] the existence of an integrated plan, of which the other crimes and the indicted offense are components").

Before he deemed this evidence admissible, the motion judge carefully considered the fourth Cofield prong, and determined the probative value of this act was high and not outweighed by any prejudice to defendant. Further, the record shows there was no less inflammatory evidence available to the State to inform the jury about defendant's plan and behavior toward Nance shortly before defendant killed Nance. Accordingly, we perceive no basis to disturb the motion

A-1491-17T4

judge's decision to admit this evidence. We also note that even without such evidence, there was overwhelming proof of defendant's guilt, given the conversations defendant had with Maisto and Koons on the day of the Nance's murder, when he specifically admitted to killing Nance.

If 404(b) evidence is found to be admissible, "the court must instruct the jury on the limited use of the evidence." Cofield, 127 N.J. at 340-41 (internal citation omitted). "[T]he court's instruction 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" Id. at 341 (quoting Stevens, 115 N.J. at 304). Here, the trial judge provided a fairly lengthy and appropriate limiting instruction regarding the jury's use of the 404(b) evidence. The trial judge properly cautioned the jurors against using this evidence to decide defendant had a tendency to commit crimes or was a bad person. "We presume that the jury faithfully followed [the] instruction[s]" it received. State v. Miller, 205 N.J. 109, 126 (2011).

II.

In Points II and III, defendant argues the trial court erred by not suppressing the E-ZPass records, even though the police obtained these records

A-1491-17T4

without a warrant. Additionally, he argues that if his convictions are not reversed, his case must be remanded for an evidentiary hearing on the motion to suppress the face masks.

A trial court's evidentiary rulings are accorded deference, absent a showing of an abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). In light of this standard of review, we find defendant's arguments unpersuasive.

To protect Fourth Amendment rights against unfounded invasions of liberty and privacy, the United States Supreme Court has required that a neutral and detached magistrate determine if probable cause existed for a search, whenever possible. Gerstein v. Pugh, 420 U.S. 103, 112 (1975). Under the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution, a warrantless search is presumed invalid, and the State has the burden to prove the search "falls within one of the few well-delineated exceptions to the warrant requirement," thus becoming valid. State v. Pineiro, 181 N.J. 13, 19 (2004) (quoting State v. Maryland, 167 N.J. 471 (2001)).

Consent is a well-recognized exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

A-1491-17T4

"Consent may be obtained from the person whose property is to be searched, from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent." State v. Maristany, 133 N.J. 299, 305 (1993) (citations omitted). The voluntary or knowing nature of Maisto's consent to a search of her Chevy Malibu is not challenged here. See State v. Sugar, 100 N.J. 214, 234 (1985).

In order to contest the admissibility of evidence obtained by a search or seizure, a defendant must first demonstrate that he has standing. State v. Bruns, 172 N.J. 40, 46 (2002). Essentially, defendant must demonstrate he has interests that are substantial enough to qualify him as a person aggrieved by the allegedly unlawful search and seizure. Jones v. United States, 362 U.S. 257, 261 (1960).

In Rakas v. Illinois, 439 U.S. 128, 143 (1978), the United States Supreme Court held that a defendant must have a legitimate expectation of privacy in the place searched or items seized to establish standing under the Fourth Amendment. However, in State v. Alston, 88 N.J. 211 (1981), the New Jersey Supreme Court established a wider-ranging standard to determine when a defendant has the right to challenge an illegal search or seizure, and the standard was not limited to a defendant's expectations of privacy. Accordingly, before reaching the substantive question of whether a defendant has a reasonable

expectation of privacy, we now look to whether a defendant has a proprietary, possessory or participatory interest in the place searched or items seized. Alston, 88 N.J. at 228.

New Jersey's Supreme Court has explained these interests as follows:

> Unlike the terms "possessory" or "proprietary," which denote property concepts, "participatory" connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity. See Black's Law Dictionary 1007 (5th ed. 1979). It thus provides standing to a person who, challenging the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence.
>
> [State v. Mollica, 114 N.J. 329, 339-40 (1989).]

Here, in a thorough and thoughtful written opinion, the motion judge found defendant had no proprietary, possessory, or participatory interest in Maisto's Chevy Malibu or its contents (noting there was no evidence showing the stop was a pretext for collecting evidence against defendant, who, weeks earlier, drove Maisto's Camry to the area of Nance's murder). The judge also found the defendant had no proprietary, possessory or participatory interest in Maisto's E-ZPass records as the Camry was registered to Maisto at the time of the violation and the E-ZPass account belonged to her. Further, as the judge

15

pointed out, a person driving on New Jersey's roadways must display a visible license plate in the front and rear of the vehicle. N.J.S.A. 39:3-33. Thus, such license plates are publicly and openly displayed, and surveillance cameras routinely capture the images of toll violators' license plates. See also State v. Donis, 157 N.J. 44, 53-54 (1998) (confirming "[p]ersonal information . . . does not include information related to . . . driving violations"). Given our deferential standard of review, we perceive no basis to disturb the motion judge's denial of defendant's suppression motion.

## III.

In Point IV, defendant argues his fifty-year NERA sentence is manifestly excessive and the sentencing court should have considered additional mitigating factors N.J.S.A. 2C:44-1(b)(3) and (4). These arguments also lack merit. Trial judges have broad sentencing discretion as long as the sentence is based on competent credible evidence and fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005). Judges must identify and consider "any relevant aggravating and mitigating factors" that "are called to the court's attention[,]" and "explain how they arrived at a particular sentence." State v. Case, 220 N.J. 49, 64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)). "Appellate review of sentencing is deferential," and we therefore avoid

substituting our judgment for the judgment of the trial court.  Id. at 65; State v. O'Donnell, 117 N.J. 210, 215 (1989); State v. Roth, 95 N.J. 334, 365 (1984).

We are satisfied the sentencing judge made sufficient findings of fact concerning aggravating and mitigating factors that were based on competent and reasonably credible evidence in the record, and that he applied the correct sentencing guidelines enunciated in the Code when he found the aggravating factors substantially outweighed the mitigating factors.  Moreover, the sentence does not shock our judicial conscience.  Accordingly, we discern no basis to second-guess the sentence.

Defendant's remaining arguments, including those raised in defendant's pro se supplemental brief, lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1491-17T4